NO. 07-04-0057-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

FEBRUARY 2, 2006
_____

JANIE SANCHEZ and KENNETH ADAMS,

Appellants

v.

LOWRY SCHAUB, M.D. and KEVIN CRAWFORD, M.D.,

Appellees
_____

FROM THE 237TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2002-518,200; HON. SAM MEDINA, PRESIDING
_____

***Opinion***
_____

Before QUINN, C.J. and CAMPBELL, J.[1]

The dispute before us involves informed consent and whether Janie Sanchez gave same to Lowry Schaub, M.D., and Kevin Crawford, M.D., before performing a stellate ganglion block on her.[2] According to the record before us, the block was her third under the recommendation or with the approval of Crawford. At the time, Crawford and Schaub

---

[1]Ex-Chief Justice Philip Johnson originally sat on the panel that heard oral argument on this case. However, he did not participate in this opinion.

[2]The block entails an injection into the recipient's spine.

had just completed a procedure whereby they placed Sanchez under general anesthesia and manipulated her wrist. Some time before undergoing the wrist manipulation but after having received the first two ganglion blocks, Sanchez verbally told Crawford that she did not want any more blocks. Because of this, Crawford suggested the wrist manipulation as an alternative.

The record further indicates that after Sanchez received the third block while under general anesthetic, a large abscess developed at the site of the injection. This resulted in her experiencing pain and eventually having several of her spinal discs fused. So, Sanchez sued the two doctors, contending, among other things, that they acted without her informed consent. Upon entertaining cross-motions for summary judgment, the trial court granted those of Crawford and Schaub while denying that of Sanchez. The two doctors had argued that their patient had consented to the block via the written consent forms executed before undergoing the manipulation. We reverse the summary judgment.

Three issues are before us. The first concerns whether Crawford and Schaub were entitled to judgment as a matter of law. The second involves whether Sanchez proved the lack of consent as a matter of law. The third covers whether the trial court erred in purportedly excluding parol evidence. We now address the first.

*Informed Consent*

As previously mentioned, Sanchez purportedly told Crawford of her refusal to undergo further blocks or other treatment entailing injections for the pain in her wrist. Nevertheless, she signed several consent forms granting him and Schaub authority to proceed with the manipulation and administer anesthetics. Therein appeared the following language:

2

I . . . understand that my physician may discover other or different conditions which *require* additional or different procedures than those planned. I . . . authorize my physician, and such associates, technical assistants and other health care providers to perform such other procedures which are *advisable* in their *professional judgment* . . . [;]

I . . . do hereby voluntarily consent and request such diagnostic procedures, hospital care, medical, surgical or x-ray treatment by Dr. Crawford, and such associates, assistants, designees, or other health care providers as are *necessary in the judgment of the doctor*, and further authorize the performance of such diagnostic studies or procedures which, *in the professional opinion of such doctor, are advisable* to attempt to remedy the condition(s) which have been explained to me as fracture left distal radius[;]

It has been explained that during the course of the operation and the procedure(s) named herein, other or different conditions may be revealed that *necessitate* an extension of the original procedure(s) or additional or different procedure(s) than those set forth herein. I . . . therefore authorize and request such doctor, his associates, assistants, designees, or other health care provider to perform such procedures as are *advisable in the professional judgment of such doctor.* The authority granted herein shall extend to remedying all conditions that require treatment and which may not be known to such doctor at the time the procedure(s) or operation is commenced . . . [;]

I . . . understand that anesthesia involves additional risks and hazards but I . . . request the use of anesthetics for the relief and protection from pain during the planned and additional procedures. I . . . realize the anesthesia may have to be changed possibly without explanation to me . . . ; [and,]

I . . . consent to the administration of any anesthesia deemed *advisable* to be applied by or under the direction of Dr. Schaub and/or an anesthesiologist on the Medical Staff of Methodist Hospital.

(Emphasis added). From the above, we see that the forms spoke in terms of informed consent *viz* the medical procedures to be completed and the anesthetics to be administered. Moreover, the words used withheld from the doctors unbridled discretion to act. For instance, their authority to undertake procedures other than the wrist manipulation (which the forms expressly alluded to) was conditioned by such terms as "advisable in their

3

professional judgment," "necessary in the judgment of the doctor," "in the professional opinion of such doctor, are advisable," "advisable in the professional judgment of such doctor," and "require[d]." In other words, Crawford (who was to perform the manipulation) was given permission to undertake other medical procedures, but they had to be necessary, required, or advisable in his professional judgment.

Similarly conditioned was the anesthesiologist's (*i.e.* Schaub's) discretion in administering anesthetics. Though one form stated that Sanchez consented to the "administration of any anesthesia," the anesthesia and its mode of administration had to be "advisable." The other form said nothing about the anesthesia being advisable by anyone. Yet, there, the "use of anesthetics" was linked to "the relief and protection from pain *during* the planned and additional procedures." (Emphasis added). So, the administration of anesthetics under the second form was dependent upon the medical procedures pursued, which, in turn, were dependent upon the doctor's professional judgment and opinion. Thus, the ability of the physicians to act and the scope of consent granted by Sanchez revolved around and were limited by concepts such as necessity, judgment, and advisability.

Next, authority holds that when practicing medicine, doctors represent that they possess the reasonable degree of skill and learning possessed by others in their profession. *Zapata v. Rosenfeld*, 811 S.W.2d 182, 184 (Tex. App.–Houston [1st Dist.] 1991, writ denied); *Dennis v. Allison*, 678 S.W.2d 511, 513 (Tex. App.–El Paso 1984), *aff'd*, 698 S.W.2d 94 (Tex. 1985); *accord Schneider v. Haws*, 118 S.W.3d 886, 890 (Tex. App.–Amarillo 2003, no pet.) (stating that physicians need only exercise ordinary or

4

reasonable care and skill under the circumstances). So too is it implicit in the performance of their trade that they will use reasonable and ordinary care and skill in the application of such knowledge to accomplish the purpose for which they are employed, *Dennis v. Allison*, 678 S.W.2d at 184, and that they will exercise their best judgment. *Zapata v. Rosenfeld*, 811 S.W.2d at 184. And, the standard against which one assesses whether these representations and duties were met is one of a reasonable physician in like circumstance. In other words, the exercise by a physician of his judgment is gauged against the accepted standards in the medical community. *Russell v. Murphy*, 86 S.W.3d 745, 749 (Tex. App.–Dallas 2002), *rev'd on other grounds*, 167 S.W.3d 835 (Tex. 2005); *see Murphy v. Russell*, 167 S.W.3d 835, 839 (Tex. 2005) (recognizing that a physician's performance of a medical procedure without prior informed consent may not necessarily result in liability if circumstances exist which, under the applicable standard of care, justify the conduct, and expert testimony may be needed to determine that). With that said, we turn to the circumstances before us.

Upon comparison of the phrases used to describe the authority afforded both doctors via the consent forms with the general duties imposed upon physicians by the law, we conclude that the forms were little more than a reiteration of the law. The former merely stated that Crawford and Schaub were accorded the ability to invoke their judgment while the latter imposed upon them the obligation to exercise their best judgment. So, the consent forms at bar actually afforded them no more or less authority and protection than that given by law. Given this, we must also conclude that whether they exceeded the leeway granted and thereby exposed themselves to liability for undertaking a procedure

5

outside the scope of Sanchez' consent depended upon whether their actions, under the circumstances appearing before them, comported with objective standards of care applicable to those in their profession.[3]  Thus, their determination that the ganglion block was needed  was not alone enough to shield them from liability if the decision nonetheless deviated from those standards of care, and we reject their argument to the contrary.  Again, what mattered is whether the decision to administer the block comported with objective medical standards of care under the circumstances before them.

Moreover, the record contains evidence indicating that not only would Sanchez have refused Crawford and Schaub permission to undertake the block had she been asked but also that she purportedly refused to undergo such a procedure before agreeing to the manipulation.  Furthermore, one can reasonably infer from that evidence (assuming it was to be believed) that Crawford knew of her refusal when discussing the block with Schaub since he was the one whom Sanchez told and who suggested the manipulation due to her refusal.  To this, we add expert testimony appearing of record that: 1) "the standard of care . . . required Schaub to wait until recovery from the general anesthesia to obtain actual and meaningful informed consent for the procedure before performing the stellate ganglion block . . ."; 2) "the standard of care . . . required that if a stellate ganglion block is to be performed without informed consent and while the patient is unconscious . . . the patient have an emergency condition involving life or death"; 3) "the standard of care . . . require[d]

---

[3]We take care to note that the same may not be true when the consent form expressly grants the physician authority to do the specific procedure done.  Our opinion should not be read to encompass that situation since those are not the circumstances here.  Again, the consent forms Sanchez executed did not expressly mention a stellate ganglion block.  So, to escape liability, Crawford and Schaub invoked clauses permitting them to undertake additional procedures and administer anesthetics deemed required, necessary, or advisable in the exercise of their judgment.

that a stellate ganglion block should never be administered while the patient is unconscious, unless there is a medical emergency involving life or death"; and, 4) "the accepted standard of care in ordering and administering a stellate ganglion block procedure require[d] the patient to be awake and able to respond and report to the medical care provider." Furthermore, we are cited to no evidence of record suggesting that there existed an emergency involving Sanchez' life or death when Crawford and Schaub opted to perform the block. Nor did our own review uncover any. Rather, it revealed the presence of evidence illustrating that the injection was made to assure the effectiveness of the wrist manipulation, not to address some medical emergency encompassing Sanchez' life or death.

In short, there appears evidence of record raising material issues of fact regarding whether the actions of Crawford and Schaub comported with accepted medical standards when performing the block. This, in turn, means that material issues of fact exist regarding whether the two physicians acted within the scope of consent granted by Sanchez. Thus, they were not entitled to judgment as a matter of law. Yet, we cannot say that Sanchez was entitled to judgment as a matter of law either. This is due to the testimony of Crawford and Schaub indicating that in their view the administration of the block was a necessary procedure under the circumstances. Given this contradictory evidence, we have no choice but to allow a factfinder opportunity to resolve the controversy.[4]

---

[4]Crawford and Schaub repeatedly allude to the decision in *Byington v. Mize*, No. 05-00-0786-CV, 2002 Tex. App. LEXIS 5008 (Tex. App.–Dallas, July 15, 2002, no pet.) as dispositive. Though similarities exist between the consent forms involved there and those at issue here, the unpublished and heretofore uncited opinion is not one upon which we can rely. This is so for several reasons, not the least of which is the absence of evidence indicating that Byington expressly told Mize not to perform the objectionable procedure. Moreover, the opinion deviates from both the Dallas court's own published opinion in *Russell v. Murphy*, 86 S.W.3d 745 (Tex. App.–Dallas 2002), *rev'd on other grounds*, 167 S.W.3d 835 (Tex. 2005) and the Supreme

*Exclusion of Parol Evidence*

As for the issue involving parol evidence, we must overrule it. We do so not because the trial court acted within the scope of its discretion when ruling but rather because we know of no particular evidence it excluded.

In granting the summary judgment, the trial court simply "sustain[ed] the defendant's objections to all summary judgment evidence that violates the parol evidence rule and . . . [ordered] such evidence stricken." Yet, what evidence, if any, purportedly violated that rule went unmentioned in the order. That is, the trial court made no determination that any particular piece of evidence offered by Sanchez was inadmissible; it simply said that it was going to strike parol evidence, whatever that evidence may be. Given this, there was and is nothing for us to review.

Given the chance that this matter may arise again on remand, we do note that while the consent form may be a contract, the provisions at issue are far from specific. Again, they do not expressly address the administration of a stellate ganglion block. As previously stated, Crawford and Schaub endeavor to find succor from open ended words such as "advisable," "professional judgment," and "professional opinion." And, because the exercise of professional judgment and opinion is dependent upon the circumstances involved and compliance with accepted medical standards applicable under those

---

Court's published opinion in that same case. *See Murphy v. Russell*, 167 S.W.3d 835, 839 (Tex. 2005). Again, the latter state that determining whether a physician acted within the scope of his consent is an objective decision dependent upon expert testimony indicating compliance with accepted community medical standards. Yet, the *Byington* panel deemed expert testimony irrelevant. So too did it imply that the subjective determination of the physician was controlling. And, we find the latter implication most interesting. How can a subjective test control when the consent form itself calls for the use of "professional" judgment and the profession is obligated to comply with generally accepted medical standards applicable to similarly situated physicians? Simply put, it cannot.

circumstances, knowledge that the patient did not want the procedure done would be a relevant circumstance to consider.

Accordingly, we reverse the summary judgment and remand the proceeding to the trial court.


Brian Quinn
Chief Justice